May it please the Court, Chad Bowers on behalf of Appellant Erik Webster. I'd ask to reserve maybe three minutes, two minutes in terms of rebuttal. Thank you. The primary issue I'd like to address today is the question of whether Mr. Webster should have the opportunity for an evidentiary hearing regarding whether he was offered a plea agreement or not at this stage of the proceedings as opposed to habeas, as the government suggests. During the 13-day trial of this case, there were four co-defendants, three of whom pled guilty the evening before the verdict was rendered with respect to Mr. Webster. The government prosecutor leading up to the day of sentence had taken the position that there was not a plea agreement offered. That wasn't necessarily as clear from Mr. Webster's standpoint, but it wasn't certain. What happened during that sentencing hearing is the Court expressed some concern about the fact that these other defendants had been given an opportunity to plead and Mr. Webster hadn't, and there was essentially, at least to my knowledge, new information provided by the government attorney at the time of the hearing when, in addressing the Court, she first says, well, there's no offer made, which is fine, it's what we heard, but then she goes on to say, well, in fact, there wasn't an offer made because he wouldn't have accepted an offer. And that is a course of another color, so to speak. And I think that under Lafler and Frye, there is an increased scrutiny of the process of determining whether a defendant had the opportunity to take a plea agreement or was given a plea agreement. And in this case, we don't have sufficient information to determine that. No question. I'm sorry. I thought you might be asking a question. So in short, the relief that we're asking is to return to the district court in order to have an opportunity to develop this record to determine whether, in fact, a plea agreement was or was not offered and why. Because you're claiming ineffective assistance of counsel because of that? I'm sorry. Is that what you – did I miss that? Well, I – I guess what I'm claiming is, at this point, it's unclear whether there was an effective assistance of counsel or not. Right. Because it's unclear whether there was a plea agreement. Because it's unclear what happened here. And so that's usually brought up in a 2255 on direct appeal. Well, and I would submit that prior to Lafler and Frye, I would agree with that. I think those cases don't create a new right, but indicate the importance of developing this not necessarily as 2255, but on the course of direct appeal. Because I'm not sure if there's an effective assistance of counsel or not, because I don't know what the terms of the plea agreement were or were not. I know, but doesn't that normally get addressed in a 2255? I think historically it has been. Okay. I am submitting an argument that, in light of these recent Supreme Court cases, that this is something that should be addressed on the direct appeal, not something that should be addressed on the 2255. Does the Court have any other questions regarding the other arguments? Those are, I think, you know, far more routine. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court, Christopher Smith with the United States. Your Honors, Mr. Webster's claim regarding plea negotiations is an undeveloped, ineffective assistance claim that should be brought on collateral review and not here on direct appeal.   appeal. This Court's precedent has been clear that it reviews ineffective assistance claims on direct appeal in only two exceptional circumstances. First, when the record is sufficiently developed to allow for meaningful review. And second, when the Sixth Amendment violation is so obviously clear from the record. Mr. Webster himself seems to recognize that neither or, rather, Mr. Webster's counsel seems to recognize that neither of these circumstances are present in this case, and that there's only serious questions regarding the plea in this case. On this basis, he requests a remand for an evidentiary hearing on the issue. Even if the facts supported this relief, which they don't, this Court's precedent squarely forecloses it. I know your colleague didn't raise this, but I'm more interested in the amount attributed, amount of drugs attributed to Mr. Webster, and I guess based primarily on Mr. Tenenmaier's conduct, and the connection or there was a sufficient basis for the district court to attribute 150 kilograms of cocaine to Mr. Webster based on the facts here. If you could focus on that and point to me or tell me why there was sufficient basis to hold Mr. Webster accountable for 150 kilos of cocaine. Yes, Your Honor. The 150 kilograms of cocaine was found by the court as being a conservative estimate of what Mr. Webster was responsible for. We know from the record that these types of motorhomes that were outfitted by this drug conspiracy could contain in a secret compartment roughly between 150 and 200 kilograms of cocaine. Where do we know that from the record? We know that from Mr. Tenenmaier's motorhome, which was confiscated by Federal authorities. And there were two data points that corroborated this with regard to Mr. Tenenmaier's motorhome, the recovered motorhome. The first is that on the trip south that the motorhome took, it was containing roughly $4.5 million in cash in the secret compartment, and an FBI special agent testified that that was attributable to a street value of cocaine of roughly 180 kilograms. Additionally, the dimensions of the secret compartment was analyzed, and an FBI special agent – I'm sorry, a DEA special agent, an expert witness testified that that compartment would contain between 150 and 200 kilograms of cocaine. And that's very compelling against Mr. Tenenmaier. I'm just trying to figure out what the evidence is that that amount that Mr. Tenenmaier was carrying was reasonably foreseeable to Webster. So focus either on the timing or, I mean, what evidence supports the reasonable foreseeability for Webster of what Mr. Tenenmaier was doing? Your Honor, there's two ways to go about it. The first – And as I ask this, because it's my understanding that Mr. Webster's RV or what he had, there were pictures taken of the compartment. It was later sold or whatever without gathering pictures or showing the dimensions or anything like that. Or it's not clear how much cocaine Mr. Webster trafficked. And so if we don't know that, then we're relying on the reasonable foreseeability aspect to attribute 150 kilograms to Mr. Webster. So that's why I'm focusing on this. I agree with that, Your Honor. And there's two different ways, I believe, to go about this. The first, focusing in on Mr. Tenenmaier's motorhome. Mr. Tenenmaier was Mr. Webster's co-conspirator. It was Mr. Tenenmaier who brought Mr. Webster into the conspiracy, said I'm driving a giant motorhome around the country with a secret compartment full of drugs. Would you like to do the same thing for this drug organization? He introduced Mr. Webster to the drug organization, and they, at that point, outfitted Mr. Webster with a motorhome similar in size to Mr. Tenenmaier's. Mr. Webster was aware that there was a secret compartment in the motorhome and was aware that that compartment contained drugs. But also he was Was he aware of how much? There's nothing in the record that says that Mr. Webster specifically saw the amount of cocaine in the secret compartment. However, Mr. Tenenmaier saw the amount of secret cocaine in his compartment, and we know that Mr. Webster and Mr. Tenenmaier talked while they were on these trips. We know that Mr. Webster knew that Mr. Tenenmaier was driving this motorhome on these trips. We know that the two were friends, that they kept in touch. And I would contend that it's reasonably foreseeable that with the size of the motorhome, with the amount that the motorhome cost, with the amount that these individuals were being paid to transport this amount of cocaine, or whether the amount that these individuals were being paid to drive these motorhomes across the country, it's reasonably foreseeable that there was a large amount of drugs in there. But isn't a conspiracy liable for all the drugs distributed by this conspiracy? Your Honor, that's correct. Simple answer. If it was reasonably foreseeable. And the government contends and the district court agreed that the amount of drugs that Mr. Tenenmaier himself was transporting was reasonably foreseeable by Mr. Webster because Mr. Webster knew that Mr. Tenenmaier was driving a motorhome. The two of them talked. They knew Mr. Tenenmaier himself knew the size of the secret compartment, explained the scheme to Mr. Webster. But moreover, we know that Mr. Webster's motorhome that Mr. Webster was driving was roughly the same size as Mr. Tenenmaier's motorhome. It was outfitted by the same drug organization. It was used in multiple trips across the country. And I think an important point, Your Honor, is that the 150 kilograms was basically what one of these RVs would hold on one trip. Mr. Webster himself took two trips personally across the country, directed another co-conspirator, Mr. Ramirez, to take two more trips, and was aware that Mr. Tenenmaier himself was driving back and forth across the country multiple times in this motorhome. Therefore, 150 kilograms may be an approximation with regard to one trip, but there were multiple trips involved here making this, as I believe this Court stated in the United States v. Alvarez, a very cautious estimation of what was occurring. What were the communications between Mr. Webster and Mr. Tenenmaier? Your Honor, the record states that the two talked on their phone when both of them were driving their RVs across the country regarding where they were driving and what was happening on the trip. There's not much more detail in the record besides that. There was no wiretaps, though. I mean, you don't know what the conversations were. No, Your Honor, but Mr. Tenenmaier himself was a cooperating witness in this case and testified extensively at trial. And that's how we know that. But he didn't, and I understand that, but he didn't say how much to Mr. Webster, because otherwise I would have thought you would have put it in the record right here up front. So you're going on what the circumstantial evidence was surrounding, well, the actual evidence surrounding the conspiracy and the circumstantial evidence that would link Mr. Webster's knowledge. Is that correct? Well, Your Honor, I believe by a preponderance, yes, that Mr. Webster was foreseeable that the amount of drugs that Mr. — it was reasonably foreseeable to Mr. Webster that Mr. Tenenmaier was transporting the amount of drugs that we have been able to accurately calculate, and that's only on one trip where there were multiple trips, and we can also infer that these RVs that were outfitted by the same drug organization of the same type, these individuals were being paid roughly the same amount to transport them across the country, that it was the same drug quantity involved. And the reason I'm asking is I thought there was something in the record that Mr. Webster did not — he said he knew he was driving, he knew there was probably contraband, but he never knew the amount. And so that's why I'm trying to figure out how the 150 was attributed to him, assuming what he says is true. Your Honor, the discussion at sentencing that was had, what the district judge ultimately found to be persuasive, based on the evidence she saw at trial, was that it was reasonably foreseeable to Mr. Webster that Mr. Tenenmaier was driving this quantity of drugs around the country. How much was he getting paid? Well, Mr. Webster did not testify at trial, but I believe that there is evidence in the record it was around $10,000 a trip. Mr. Tenenmaier was being paid, I believe, a little bit more to transport these motorhomes from Mexico over the borders. And as the district judge pointed out at sentencing, it would be strange for a drug organization to use such a large vehicle to pay this amount of money to go through the expense of outfitting this vehicle and not transport a very large quantity of drugs because the drugs could be moved in smaller quantities in smaller vehicles that were less of a target to law enforcement. And that's an important point, Your Honor, that I think that not only — if we were dealing only with Mr. Tenenmaier's RV here and the drugs that were transported in Mr. Tenenmaier's RV, that could be reasonably foreseen by Mr. Webster because Mr. Tenenmaier brought Mr. Webster into the conspiracy, told him what he was doing. Perhaps if Mr. Tenenmaier had transported drugs by airplane or some other means of transportation, perhaps that wouldn't be reasonably foreseeable. But Mr. Tenenmaier's — the compartment in the motorhome was exactly what Mr. Tenenmaier himself told Mr. Webster he was doing. But there was never, unless I'm wrong, there was never any testimony from Mr. Tenenmaier that I told him we traffic in this amount of money or this amount of drugs. I believe that the testimony in the record does not contain a specific amount. However, there is testimony in the record where Mr. Tenenmaier told Mr. Webster, I'm driving this very large RV and it has a secret compartment in it that is filled with drugs, and I believe he uses the term cocaine in there. And I would submit that that can be reasonably foreseen, that 150 kilograms is not that large of an amount of drugs to be hidden in one of these RVs that's the size of a small semi-truck. But it was specifically intained to the bathroom compartment right underneath where the — It was by the shower, I believe. Right. Okay. It was by the shower. And, again, I want to focus in on the fact that one of these RVs held that on one trip, whereas Mr. Webster himself took two trips, directed another individual, Mr. Ramirez, to take another two trips. Both of those were clearly reasonably foreseeable and knew that Mr. Tenenmaier himself was taking multiple trips. And even though the district judge did attribute 150 kilograms of cocaine to Mr. Webster, she did, in the end of the day, give Mr. Webster a downward variance because of the pleas. Therefore, Mr. Webster's offense level was knocked down, I believe it was, to a 38 or a 39. She sentenced him near the bottom of that range at 300 months. Therefore, Mr. Webster did get the benefit of some leniency at sentencing on this. And, Your Honors, I would submit that the other two issues are well briefed by the appellant and ourselves, if Your Honors have no further questions. The other defendants pled guilty in the middle of the trial. Is that what happened? It was towards the end of the trial, Your Honor. It was while it was still before being tried to the jury? It was directly before closing arguments. Okay. Did the district court say anything about what happened to the other people? Yes, Your Honor. The district court gave Ninth Circuit model jury instruction 2.14, which is the model jury instruction regarding missing defendants when this type of thing happens at the end of the trial, and simply noted that these defendants were not present, told the jury not to speculate why, and to address only Mr. Webster's guilt. And I point out that this was the approach that this Court has counseled in the United States in a number of cases, and here, especially under a plain error standard of review, it's hard to see how. There was no motion for mistrial or what? There was no motion for mistrial. And the instruction that was given was ultimately not objected to by defense counsel. Thank you. Thank you. There's a lot of people disappearing. Okay. Just briefly, Your Honor, you hit it on the head. Everyone concedes that there's some large quantity of drugs that could be involved in a motorhome of this size or paying runners of this size to deliver the products of Mr. Webster, but there's very little evidence to demonstrate what that large number should be. The jury found there was more than 5 kilograms involved, and that's clearly the case. Mr. Tenmaier was a cooperating witness for the United States. He had the prosecutors had the opportunity to develop from him what were your thoughts, Mr. Webster, about drug quantity? Mr. Webster is, other than this involvement, there's no indication that he has a history in the drug business or that he necessarily understands what quantity that he or Mr. Tenmaier were involved with. So I think the question becomes, and the question that I think needs to be developed further that we've raised, is how much is a large quantity? And all we have on that is what this amount of quantity and the size of this compartment. Also note that there was a different mobile home used on one of the trips that Mr. Webster took. I don't remember if the dimensions of that motorhome are on the record, but it was much smaller. It was sort of a preliminary trip to determine whether or not, I think it can be assumed, whether or not he was honest and reliable in delivering the product. So it's not a tremendous deal, but it goes to the issue of trying to determine how much was involved. Were you trial counsel? Unfortunately, I was not, Your Honor, and I was brought in only, which made it even more complicated, but only for the purposes of sentencing. So I was not involved in the trial. That was a different lawyer. All right. Thank you very much. I appreciate your arguments today. The case is now submitted. We are in recess. I understand there's some law students here or students here. Feel free to talk to our law clerks, and then we'll come out afterwards and join you. Thank you.
judges: Schroeder, Noonan, Murguia